**IN THE COURT OF APPEALS OF IOWA**

No. 13-1993
Filed April 16, 2014

**IN THE INTEREST OF K.S.,**
**Minor Child,**

**S.K., Mother,**
 Appellant.
_____

Appeal from the Iowa District Court for Polk County, Louise Jacobs,
District Associate Judge.

A mother appeals from the order terminating her parental rights.
**AFFIRMED.**

Britt Gagne of Gagne Law Office, Des Moines, for appellant mother.

Shane Michael, Des Moines, for father.

Thomas J. Miller, Attorney General, Kathrine Miller-Todd, Assistant
Attorney General, John P. Sarcone, County Attorney, and Annette Taylor,
Assistant County Attorney, for appellee State.

M. Kathryn Miller, Des Moines, for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Mullins, JJ.

**DANILSON, C.J.**

A mother appeals the termination of her parental rights to her child, K.S.[1] The mother has cooperated with the Iowa Department of Human Services (DHS) since her release from prison and made efforts to stay in contact with the child during her incarceration. Unfortunately, the mother sent K.S. to reside with her paternal grandmother for six months before her probation was revoked and was later incarcerated for a period of about one year. Her criminal conduct involved neglect of a child whose care had been entrusted to her. The mother requested additional time for reunification at the termination hearing, but "our legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Her past decisions and the time the child has endured in limbo support affirming the district court's order terminating the mother's parental rights.

**I. Background Facts and Proceedings.**

K.S. was born in November 2008. Shortly before her birth, the mother was charged with and pled guilty to neglect of a dependent person after she "just tossed" a child she was caring for onto a couch or chair. This caused serious injury to the child. The mother received a deferred judgment and enrolled in the youthful offender program.

In late 2010, the mother sent K.S. to live with K.S.'s paternal grandmother in Virginia. K.S. resided with the grandmother until the grandmother sent K.S. to live with her father in July 2011. The mother was living in a halfway house at that

---

[1] The parental rights of the father have also been terminated. He does not appeal.

time, but she resided with K.S. and the father at his home when she had furloughs. The mother also lived with the father and K.S. when she "went on the run" from the halfway house. As a result, in September 2011, the mother was arrested and placed in the Polk County jail. Eventually her deferred judgment was revoked, and she was sentenced to ten years in prison.

K.S. remained in her father's care until April 25, 2012. K.S. was removed due to concerns that the father was both selling and using illegal substances in the home. She was adjudicated a child in need of assistance (CINA) on May 4, 2012.

During her time in prison, the mother wrote letters to K.S. The mother also testified that she participated in all of the available programs that she believed would increase the chances K.S. would be returned to her care upon her release.

The State filed a petition to terminate parental rights on April 11, 2013. The original termination hearing was scheduled for May 2013, but that hearing was continued because the parties agreed DHS had failed to distribute reports in a timely manner. The hearing was moved to the next available court date, September 20, 2013. In the meantime, the mother was released from prison into a halfway house in May 2013. She moved into her own apartment in August 2013.

At the September termination hearing, the mother testified that she was attending the Iowa School of Beauty. She also testified that she had no intention of continuing any relationship with the father. The mother did not request to have K.S. returned to her care at that time, but rather requested additional time to

"create a better bond" with her daughter and to work on K.S.'s "trust issues." The mother also testified she would be willing to attend family therapy if she was provided with more time.

The juvenile court filed an order terminating the mother's parental rights on December 3, 2013. In it, the court explained:

> The significant number of different caregivers in such a short life raises real concern that [K.S.] will develop reactive attachment disorder. The child's therapist provided an updated opinion as to how [K.S.] was doing in regards to such a concern. The therapist reported that if [K.S.] stayed in her current home that she will not need therapy, "but if there is a change in placement, she will need to continue in individual and family therapy to help adjusting to the move and the loss of her current home and family." The therapist reported that [K.S.] is very attached to the foster parents and her "siblings" (other foster family members).
>
> The therapist recommended that [K.S.] be in a home that can provide her with consistent support. While [the mother] asserts she is much different now, it is still unclear whether [she] will be able to maintain the minimum stability she has exhibited since she returned to the community from prison. This most recent stability is the result, in part, of her being under the supervision of her parole officer.
>
> When [the mother] was last in the community, she could not comply with her probation requirements. [The mother] is doing better now, but she has yet to demonstrate whether she can maintain stability after she is released from parole. She is just learning how to care for herself. As for [K.S.], the child's therapist states that "it will be very difficult for [K.S.] both emotionally and mentally to have moved out of her current [foster family] home . . ." While [the mother] admits to making mistakes such as tossing a child on a couch (resulting in her criminal charges), or not following the conditions of the Youthful Offender program and her probation, she minimizes the effect such choices has had and will continue to have on [K.S.]. When questioning about such effects, [the mother] was unable to demonstrate an understanding of the difficulty for her child that a change in custody would create.

(Citations to record omitted.) The court terminated the mother's parental right pursuant to Iowa Code sections 232.116(1)(b), (d), (e), (f), (i), and (*l*) (2013). The mother appeals.

**II. Standard of Review.**

Our review of termination decisions is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We give weight to the juvenile court's findings, especially assessing witness credibility, although we are not bound by them. *D.W.*, 791 N.W.2d at 706. An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence. *Id.*

**III. Discussion.**

Iowa Code chapter 232 termination of parental rights follows a three-step analysis. *P.L.*, 778 N.W.2d at 39. The court must first determine whether a ground for termination under section 232.116(1) has been established. *Id.* If a ground for termination has been established, the court must apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in termination of parental rights. *Id.* Finally, if the statutory best-interest framework supports termination of parental rights, the court must consider if any of the statutory exceptions set out in section 232.116(3) weigh against the termination of parental rights. *Id.*

**A. Grounds for Termination.**

When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the order on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707. Iowa Code section 232.116(1)(f) provides that termination may be ordered when there is clear and convincing evidence the

child is four years of age or older, has been adjudicated a CINA, has been removed from the physical custody of the parent for at least twelve of the last eighteen months, and cannot be returned to the parent's custody at the time of the termination hearing.

Here, the mother does not contend that any of the elements for termination under section 232.116(1)(f) are not met, but rather claims that if given another six months for reunification, termination would not be necessary. We note that the mother has cooperated with DHS since her release from prison and has made some progress bonding with K.S. and demonstrating her ability to parent the child; however, she did not request to have K.S. returned to her at the time of the termination hearing.

"Ultimately, the issue is not parental culpability but whether the statutory requirements have been met." *In re A.M.*, 843 N.W.2d 100, 111 n.9 (Iowa 2014). K.S. has not been in her mother's care since September 2011. The mother sent K.S. to live with her paternal grandmother, had her probation revoked, and was incarcerated for almost all of the proceedings. "In order to continue placement for six months, the statute requires the court to make a determination the need for removal will no longer exist at the end of the extension." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). Here, we cannot conclude there is even a strong likelihood that the child can be returned to the mother.

The child should not be required to wait in limbo in hope that the mother can become a stable and reliable caretaker. As our supreme court has stated, "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791

N.W.2d at 707. Furthermore, the DHS caseworker, the child's therapist, and the guardian ad litem recommended termination. *See A.M.*, 843 N.W.2d at 111.

As part of her request for additional time, the mother also argued DHS had failed to provide her with timely services. Specifically, she claims DHS failed to provide her with a parent partner. However, the mother admitted the DHS worker contacted the parent partner program for her and found that no one was able to travel to the halfway house in Marshalltown where the mother was staying at the time. Furthermore, there is no indication the mother's participation in the service would have changed the outcome of the termination hearing. At the time of the hearing, DHS did not have any complaints about the mother's actions during supervised visits with the child.

Here, DHS did provide the family with reasonable services, and there is clear and convincing evidence the grounds for termination, pursuant to section 232.116(1)(f), have been met.

**B. Best Interests of the Child.**

Even if a statutory ground for termination is met, a decision to terminate must still be in the best interests of a child after a review of section 232.116(2). *P.L.*, 778 N.W.2d at 37. In determining the best interests of the child, we give primary consideration to "the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional conditions and needs of the child." *See* Iowa Code § 232.116(2).

K.S. has not been in her mother's full-time care since late 2010 when the mother sent the child to live with the paternal grandmother. Although we acknowledge the mother may have assisted in providing the child's care while on

furlough from the halfway house during the period of July 2011 until the mother was incarcerated in September 2011, termination will enable K.S. to achieve permanency. *See A.M.*, 873 N.W.2d at 113 (citing *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home")). As recognized by the district court, the best interest of K.S. is for her to remain with her foster family. They have consistently cared for her and provided her with safety and stability. This is especially important because of the many disruptions in care K.S. has already experienced at her young age. K.S. has been integrated into her foster family and they are willing to adopt her if the mother's parental rights are terminated.

We agree with the juvenile court's finding that it is in the child's best interests to terminate the mother's parental rights.

### C. Potential Grounds Not to Terminate

Iowa Code section 232.116(3) provides that "[t]he court need not terminate the relationship between the parent and child" under certain circumstances. A finding under subsection 3 allows the court not to terminate. *See P.L.*, 778 N.W.2d at 39. "The factors weighing against termination in section 232.116(3) are permissive, not mandatory, and the court may use its discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship. *A.M.*, 873N.W.2d at 113

The mother did not argue any of the exceptions or factors against termination apply in this case. Upon our de novo review, we conclude no

exception or factor in section 232.116(3) applies to make termination unnecessary.

## IV. Conclusion.

There is clear and convincing evidence that grounds for termination exist under section 232.116(1)(f), termination of the mother's parental rights is in the child's best interests pursuant to section 232.116(2), and no consequential factor weighing against termination in section 232.116(3) requires a different conclusion. Accordingly, we affirm termination of the mother's parental rights.

**AFFIRMED.**